IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN BAKER<br>884 Brownville Rd<br>Rome, Ohio, 44085<br>    Plaintiff, <br><br>  v. <br><br>MIDWEST FIRST STAR, INC.<br>1850 Tossing Mane Court<br>Centerville, Ohio, 45458<br><br>  **Serve also:**<br>    c/o Farooq Shah, Statutory Agent<br>    1850 Tossing Mane Court<br>    Centerville, Ohio, 45458<br><br>  -and-<br><br>FAROOQ SHAH<br>1850 Tossing Mane Court<br>Centerville, Ohio, 45458<br><br>  -and-<br><br>TAMMY GIACOBBE<br>333 Lincoln St<br>Amherst OH 44001<br><br>    Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.<br><br>JUDGE<br><br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREIN** |

Plaintiff, Brian Baker, by and through undersigned counsel, as his Complaint against Defendants states and avers the following:

## **PARTIES.**

1. Baker is a resident of Ashtabula County, Ohio.

2. Midwest First Star, Inc. ("Midwest") is an Ohio Limited Liability Corporation that owns and operates "Hardees" fast food restaurants throughout Ohio, Indiana, and Kentucky, to include the "Hardees" restaurant located at 65 S. Chestnut St, in Jefferson, Ohio ("Jefferson Hardees").

3. Shah is a resident of Montgomery County, Ohio and is owner, president, and or CEO of Midwest.

4. Giacobbe is a resident of Lorain County, Ohio and, at all times referenced herein, was a General Manager and/or District Manager for Midwest.

## PERSONAL JURISDICTION.

5. Midwest is an Ohio limited liability company; hires citizens of the state of Ohio, contracts with companies in Ohio, and owns or rents property in Ohio.

6. Shah and Giacobbe are residents of Ohio; contract with companies in Ohio, and own or rent property in Ohio.

7. As such, the exercise of personal jurisdiction over Defendants comports with due process.

8. This cause of action arose from or relates to events that occurred in this district, thereby conferring specific jurisdiction over Defendants.

## SUBJECT MATTER JURISDICTION.

9. This Court has original subject matter jurisdiction of this case under 28 U.S.C. §§1331 and 1341, inasmuch the matters in controversy are brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C § 215, 216, et seq.

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Baker's state law claims under the Ohio Minimum Fair Wages Standards Act ("OMFWSA"), Ohio R.C. § 4112.02(A), R.C. § 2307.51, R.C. § 4113.15, R.C. 2307.60(A)(1), and any other Ohio claims made herein because those claims derive from a common nucleus of operative facts.

11. Venue is proper in this District because Midwest resides in this District (28 U.S. Code § 1391(b)(1).

## FLSA COVERAGE.

12. At all times referenced herein, Midwest formed a single enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r) and formed a single enterprise engaged in

2

commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise at all times hereinafter mentioned had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person and in that enterprise had an annual gross volume of sales made or business done of not less than $500,000.00.

13. At all times referenced herein, Baker was an "employee" of Midwest within the meaning of 29 U.S.C. § 203(e) and R.C. § 4111.03(D)(3).

14. At all times referenced herein, Midwest was Baker's employer within the meaning of 29 U.S.C. § 203(d) and R.C. § 4111.03(D)(2).

15. At all times referenced herein, Shah was a "person" as that term is defined by 29 U.S.C. § 203(a) and an "employer" within the meaning of 29 U.S.C. § 203(d) and R.C. § 4111.03(D)(2).

16. At all times referenced herein, Giacobbe was a "person" as that term is defined by 29 U.S.C. § 203(a) and an "employer" within the meaning of 29 U.S.C. § 203(d) and R.C. § 4111.03(D)(2).

## FACTUAL ALLEGATIONS.

17. Baker is a former employee of Midwest.

18. Baker was hired by Midwest in or around January of 2016 to work as a General Manager of the Jefferson Hardees.

19. As a General Manager, Baker was promised a salary of $45,000.00 annually.

20. Soon after Baker was hired, Shah induced him to travel to Kokomo, Indiana for "training."

21. The journey from Baker's residence to Kokomo, or vice versa, takes approximately five and a half hours to complete.

22. Baker drove to Kokomo for his training.

3

23. Baker arrived in Kokomo on or about January 16, 2023.

24. Baker stayed in a hotel in Kokomo that was provided by Midwest.

25. Upon arriving in Kokomo, Shah directed Baker to watch training videos in his hotel room.

26. Baker spent approximately 4-5 hours watching Midwest training videos in his hotel room.

27. From January 17, 2023, through January 20, 2023, Baker worked at a Midwest Hardees location in Kokomo ("Kokomo Hardees").

28. Baker worked at the Kokomo Hardees cooking food from approximately 8:00am until 7:00pm or 8:00pm each day he was there, with no *bona-fide* lunch break.

29. Baker's drive to Kokomo; his training at the hotel; his work at the Kokomo Hardees, and his return trip to Rome, Ohio is hereinafter referred to as the "Indiana Work."

30. Baker worked over 40 hours during the workweek in which he performed the Indiana Work.

31. Upon returning to Ohio, Baker worked at the Jefferson Hardees.

32. As a new General Manager, Baker never received keys to the Jefferson Hardees, and he had to rely on others to let him in.

33. Pursuant to Midwest's pay schedule, Baker was supposed to receive his first paycheck on February 1, 2023 ("First Paycheck").

34. Baker did not receive his First Paycheck.

35. Baker complained to Giacobbe that he had not received his First Paycheck.

36. Giacobbe told Baker that she would contact "Ibu" (last name unknown, believed to be "Farooq" at Midwest corporate to get the check issued.

37. On or about February 13, 2023, Baker received his First Paycheck from Midwest.

38. The First Paycheck was for the pay period in which Baker performed the Indiana Work, totaling $741.84.

39. On or about February 16, 2023, Baker's First Paycheck was dishonored by Midwest's bank.

4

40. As a result of Midwest dishonored Paycheck, Baker's bank account balance became negative, and he incurred bank fees.

41. Baker immediately notified Giacobbe that his First Paycheck had "bounced" and he requested a replacement check.

42. Giacobbe told Baker she would take care of this dishonored First Paycheck "immediately."

43. Giacobbe failed to "immediately" address Baker's dishonored First Paycheck.

44. Baker continued to follow up with Giacobbe about his dishonored First Paycheck, but Giacobbe did not respond.

45. On or about February 17, 2023, Baker met Shah in person for the first time.

46. When Baker met Shah, he complained to Shah about his dishonored Paycheck and stated that he had not been anything for the Indiana Work her performed.

47. Shah responded by instructing Baker to have his bank "re-run the check."

48. There is no such thing as having a bank "re-run" a dishonored check.

49. Shah's statement to Baker to have his bank "re-run" the check amounted to gaslighting and a refusal to pay Baker the wages he was owed.

50. Subsequently, Baker contacted his bank about whether it was possible to "re-run" the dishonored check.

51. A representative from Baker's bank informed Baker that the bank could not "re-run" an already dishonored check.

52. Subsequently, Baker continued to follow up with Giacobbe regarding payment for the Indiana Work.

53. Baker further complained to Giacobbe that he had met with Shah and felt like he was "getting the runaround" about being paid the wages he was owed:



54. On February 21, 2023, Tammy asked Baker if he got paid for the Indiana Work.

55. Baker replied "No."

56. On or about February 22, 2023, Baker arrived to work at the Jefferson Hardees to find it closed, with no one there working.

57. Baker immediately contacted Giacobbe, who told Baker that she was working at the Seville, Ohio Hardees and could not talk.

58. The Jefferson Hardees remained closed for several weeks after February 22, 2023, but Baker was never scheduled to work again, or to work at any other locations.

59. Baker continued to reach out to Giacobbe about the status of his employment, but she never responded to him.

60. Baker never heard from Midwest, Giacobbe, or Shah again.

61. Subsequently, Baker learned that Midwest had posted Baker's job on Indeed.com, a job search website where employers solicit applications for jobs, on or about February 23, 2023

62. A true and accurate copy of an email Baker received from Indeed describing this job posting is reproduced below:



63. Defendants terminated Baker because he made protected complaints about not being paid any wages – i.e., less than the minimum wage – for the workweek of January 16, 2023.

64. Upon information and belief, Shah directed Giacobbe to terminate Baker, and Giacobbe did so not by directly notifying Baker of his termination but by "ghosting" him.

65. Baker has never been paid any wages whatsoever for the Indiana Work, destroying his non-exempt status for that week and entitling him to at least the minimum wage for all hours worked and overtime.

7

66. As a result of Defendant's wrongdoing, Baker has suffered and continues to suffer harm.

## COUNT I: VIOLATION OF THE FAIR LABOR STANDARDS ACT.
### (Asserted Against Midwest Only)

67. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

68. While performing the Indiana Work, Baker was not exempt from receiving minimum wage or overtime under the FLSA because, despite his job title, his duties for that week were non-executive, non-administrative and geared toward the production of Midwest's product.

69. Baker is further entitled to the minimum wage and overtime for the Indiana Work because he was not paid on a "salary basis" for that week.

70. Midwest failed to pay Baker the applicable minimum wage for any of the hours he worked as a part of the Indiana Work.

71. Midwest failed to pay Baker an overtime premium for the overtime hours he worked as a part of the Indiana Work.

72. Midwest's failure to pay Baker was intentional, willful, and/or reckless.

73. In violating the FLSA, Midwest acted without good faith or a reasonable basis for committing said violations, as no reasonable employer could believe that it is lawful to fail and refuse to pay an employee at all for their work.

74. As a direct and proximate result of Midwest's conduct, pursuant to 29 U.S.C. § 216(b), Midwest is liable to Baker for the full amount of the required minimum wage rate, all overtime wages due, an additional equal amount as liquidated damages, as well as costs and reasonable attorney fees.

## COUNT II: UNLAWFUL RETALIATORY TERMININATION
## IN VIOLATION OF 29 U.S.C. § 215(A)(3).
## (Asserted Against All Defendants).

75. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

76. Pursuant to 29 U.S.C. § 215(a)(3), it is unlawful for any person to retaliate against an employee who seeks to enforce that employee's rights under the FLSA.

77. Defendants unlawfully terminated Baker after he made repeated complaints about not being paid for the Indiana Work.

78. Defendants violated 29 U.S.C. § 215(a)(3) of the FLSA and showed reckless disregard of the provisions of the FLSA concerning retaliation by taking adverse actions against Baker because he engaged in protected activity by seeking the proper payment of his wages.

79. As a result of Defendants' deliberate, unlawful, and willful acts as set forth above, Baker has suffered loss of earnings, earnings potential, other significant economic benefits, and emotional distress.

## COUNT III: VIOLATION OF THE INDIANA MINIMUM WAGE LAW
## (Ind. Code § 22-2-2-1 et. seq).
## (Asserted Against Midwest Only)

80. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

81. At all relevant times, Midwest has been, and continue to be, an "employer" within the meaning of Ind. Code § 22-2-2-3.

82. At all relevant times, Midwest had employed and continue to employ "employees," including Baker, within the meaning of Ind. Code § 22-2-2-3.

83. In 2023, the Indiana Minimum Wage Law required employers to pay a minimum wage of at least $7.25 per hour to all non-exempt employees.

84. In 2023, Midwest failed to pay Baker $7.25 or greater per hour for the Indiana Work.

9

85. In denying compensation at the requisite Indiana minimum wage rate Midwest violated the Indiana Minimum Wage Law.

86. As a direct and proximate result of Midwest's unlawful conduct, Baker has suffered and will continue to suffer a loss of income and other damages.

87. Having violated the Indiana Minimum Wage Law, Midwest is liable to Baker pursuant to Ind. Code § 22-2-2-9 for the full amount of his unpaid wages, an equal amount in liquidated damages, and for costs and reasonable attorneys' fees.

### COUNT IV: FAILURE TO PAY EARNED BENEFIT IN VIOLATION OF R.C. § 4113.15 (OHIO PROMPT PAYMENT ACT).
### (Asserted Against Midwest Only)

88. Baker incorporates by reference the allegations in the preceding paragraphs.

89. During all times material to this complaint, Midwest was covered by the Ohio Prompt Payment Act, R.C. § 4113.15 ("OPPA").

90. During all times material to this complaint, Baker was employed by Midwest within the meaning of OPPA.

91. Baker earned wages during his employment with Midwest, an Ohio employer, that were due on or around February 1, 2023, that Midwest failed and refused to pay him.

92. There is no dispute in this matter that Baker is owed wages for the work he performed for Midwest.

93. At the conclusion of his employment with Midwest, Baker was not paid his earned wages within 30 days of performing the work. *See* O.R.C.§ 4113.15(B).

94. Baker's unpaid wages remained unpaid for more than thirty (30) days beyond his regularly scheduled paydays.

95. Baker notified Midwest that he had not received his earned wages no later than February 9, 2023.

96. In violating the OPPA, Midwest acted willfully, without a good faith basis and with reckless disregard of clearly applicable Ohio law.

97. As a result of Midwest's wrongful conduct as stated above, Baker has suffered and continues to suffer damages.

98. As a direct and proximate result of Midwest's wrongful conduct, Baker is entitled to all damages provided for in R.C. § 4113.15, including an amount equal to six percent of the amount still unpaid or two hundred dollars, whichever is greater.

### COUNT V: UNLAWFUL RETALIATORY TERMININATION
### IN VIOLATION OF THE OMFWSA (R.C. 4111.13) AND OHIO CONSTITUTION
### (Asserted Against All Defendants).

99. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

100. Pursuant to R.C. 4111.13(B) as interpreted in light of R.C. 4111.02, Article II, Section 34a of the Ohio Constitution, and 29 U.S.C. §203(d), it is unlawful for any person to retaliate against an employee who seeks to enforce that employee's rights under the OMFWSA.

101. Article II, Section 34a of the Ohio Constitution provides that:

> No employer shall discharge or in any other manner discriminate or retaliate against an employee for exercising any right under this section or any law or regulation implementing its provisions […] An action for equitable and monetary relief may be brought against an employer by […] an employee […] in any court of competent jurisdiction, […] for any violation of this section or any law or regulation implementing its provisions […] Where an employer is found by the state or a court to have violated any provision of this section, the employer shall within thirty days of the finding pay the employee back wages, damages, and the employee's costs and reasonable attorney's fees. Damages shall be calculated as an additional two times the amount of the back wages and in the case of a violation of an anti-retaliation provision an amount set by the state or court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued.

102. R.C. 4111.14(J) states that:

> In accordance with Section 34a of Article II, Ohio Constitution, damages shall be calculated as an additional two times the amount of the back wages and in the case of a

11

    violation of an anti-retaliation provision an amount set by the state or court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued. The "not less than one hundred fifty dollar" penalty specified in division (J) of this section shall be imposed only for violations of the anti-retaliation provision in Section 34a of Article II, Ohio Constitution.

103. Defendants unlawfully terminated Baker after he made repeated complaints about not being paid for the Indiana Work.

104. Defendants violated R.C. 4111.13(B) and the Ohio Constitution, and showed reckless disregard of their provisions concerning retaliation by taking adverse actions against Baker because he engaged in protected activity by seeking the proper payment of his wages.

105. As a result of Defendants' deliberate, unlawful, and willful acts as set forth above, Baker has suffered loss of earnings, earnings potential, other significant economic benefits, and emotional distress and is entitled to liquidated damages, including no less than $150.00 per day until this violation is corrected, attorney fees, and costs.

## COUNT VI: CIVIL ACTION FOR DAMAGES FOR CRIMINAL ACT – PASSING BAD CHECKS (R.C. 2307.60). (Asserted Against Midwest Only)

106. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

107. Pursuant to R.C. 2913.11(B): "No person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored or knowing that a person has ordered or will order stop payment on the check or other negotiable instrument."

108. Pursuant to R.C. 2307.60(A)(1):

    Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

109. By issuing the dishonored First Paycheck to Baker, Midwest issued a bad check.

110. By issuing the dishonored First Paycheck to Baker, Midwest violated R.C. 2913.11(B).

111. Midwest's continued nonpayment of Baker for the Indiana Work demonstrates intentionality and malice.

112. As a direct and proximate cause of Midwest' wrongful conduct, Baker suffered and will continue to suffer damages.

### COUNT VII: IMPLIED CONTRACT
### (Asserted Against Midwest Only)

113. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

114. Midwest offered Baker employment, including the Indiana Work.

115. Baker accepted Midwest's offer.

116. Baker's performance of the Indiana Work constituted acceptance of Midwest's offer of employment.

117. The representations of Midwest and its agents, as well as money actually paid to Baker establish that Midwest was to pay Baker an annual salary of $45,000.00.

118. Baker was not paid for the Indiana Work.

119. Midwest's non-payment of Baker for the Indiana Work constitutes a breach of implied contract.

120. Baker was not in breach of the contract at the time of Midwest's breach.

121. Midwest's breach damaged Baker.

122. As a result of Midwest's breach, Baker suffered lost wages, lost opportunities, and damages resulting from the dishonored First Paycheck.

123. As a direct and proximate cause of Midwest' wrongful conduct, Baker suffered and will continue to suffer damages.

### COUNT VIII: PROMISSORY ESTOPPEL
### (Asserted Against Midwest Only)

124. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

125. Midwest represented to Baker that he would be paid, on a salary basis, $45,000.00 per year.

126. Baker relied on Midwest's representations.

127. It was reasonable for Baker to rely on Midwest's representations.

128. Baker's reliance on Midwest's representations caused him to perform the Indiana Work.

129. Midwest did not compensate Baker for the Indiana Work.

130. Baker's reliance on Midwest's representations was detrimental to Baker.

131. The detriment to Baker included, but was not limited to lost wages, lost opportunities, and damages resulting from the dishonored First Paycheck.

132. As a direct and proximate cause of Midwest' wrongful conduct, Baker suffered and will continue to suffer damages and injustice can be avoided only by enforcing the promise Midwest made to Baker.

## COUNT IX: UNJUST ENRICHMENT/QUANTUM MERUIT
### (Asserted Against Midwest Only)

133. Baker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

134. Baker, in performing the Indiana Work, conferred a benefit on Midwest.

135. Midwest was aware that Baker was performing the Indiana Work.

136. Midwest benefited from the Indiana Work.

137. Baker suffered detriment as a result of his performance of the Indiana Work.

138. It would be unjust to allow Midwest to retain the benefit provided by the Indiana Work without compensation to Baker.

139. Baker is entitled to either the value of his services, or the amount Midwest benefitted from the Indiana Work.

## DEMAND FOR RELIEF

WHEREFORE, Baker prays for judgment in his favor against Midwest containing the following relief:

(a) An order requiring Midwest to restore Baker to one of the positions to which he was entitled by virtue of his application and qualifications and expunge his personnel file of all negative documentation;

(b) An award against Defendants of compensatory and monetary damages to compensate Baker for lost wages, benefits bestowed on and unjustly retained by Midwest, as well as consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against Midwest in an amount in excess of $25,000;

(d) An award of reasonable attorney's fees, liquidated damages (including no less than $150.00 per day until Defendants' violation of the OMFWSA is corrected) and non-taxable costs for Baker's claims as allowable under law;

(e) An award of the taxable costs of this action; and,

(f) An award of such other relief as this Court may deem necessary and proper.

          Respectfully submitted,

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:   (216) 291-5744
Email:  chris.wido@spitzlawfirm.com

*Attorney For Plaintiff*

## JURY DEMAND

Plaintiff Brian Baker demands a trial by jury by the maximum number of jurors permitted.

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**

15